**Electronically Filed
Intermediate Court of Appeals
28274
07-APR-2011
08:39 AM**

NO. 28274

IN THE INTERMEDIATE COURT OF APPEALS

OF THE STATE OF HAWAIʻI


KAILUA LOCAL CAB, INC., a Hawaiʻi corporation,
Plaintiff-Appellant,
v.
AJA MOTORS CORP., Defendant-Appellee,
and
VAN-CON, INC., a New Jersey Corporation,
JOHN DOES 1-50; JANE DOES 1-50; DOE PARTNERSHIPS
1-50; DOE CORPORATIONS 2-50; DOE ENTITIES 1-50;
DOE GOVERNMENTAL UNITS 1-50, Defendants


APPEAL FROM THE CIRCUIT COURT OF THE FIRST CIRCUIT
(CIVIL NO. 04-1-0522)


MEMORANDUM OPINION
(By:  Foley, Presiding J., Fujise and Reifurth, JJ.)

Plaintiff-Appellant Kailua Local Cab, Inc. (Kailua Cab) appeals from the Final Judgment filed on September 26, 2006 in the Circuit Court of the First Circuit[1] (circuit court).  The circuit court entered judgment in favor of Defendant-Appellee AJA Motors Corp. (AJA Motors) and against Kailua Cab in the amount of $100,000 for compensatory damages on Count V of AJA Motors' July 14, 2004 Counterclaim (Counterclaim) and $50,000 in punitive

---

[1]  The Honorable Karen S.S. Ahn presided.

damages pursuant to Count VI[2] of the Counterclaim. The circuit court dismissed all of the claims in Kailua Cab's Complaint filed on March 19, 2004 (Complaint) and the remainder of the claims contained in the Counterclaim.

## I. BACKGROUND

In the early 2000s, Kailua Cab supplied school bus transportation to handicapped and other students, under a contract with the State of Hawai'i Department of Education (DOE). To fulfill a contract with the DOE, Kailua Cab needed to purchase twelve additional buses. In early 2002, Kailua Cab went to Andrew J. Anderson (Anderson), AJA Motors' president, to purchase the needed buses because Kailua Cab had previously purchased buses from AJA Motors.

### A. PURCHASE CONTRACT

On March 27, 2002, Kailua Cab signed a six-page Sales Proposal/Sales Order (the Contract) to purchase twelve school buses from AJA Motors. Stanley Tomasa (Tomasa), Kailua Cab's president, signed the Contract, which had been prepared by Anderson, who also signed it as a "dealer or authorized representative"[3] of AJA Motors. At the time the parties entered into the Contract, AJA Motors was a franchisee of Van-Con, Inc. (Van-Con), a New Jersey corporation.

According to the Contract, AJA Motors would supply twelve buses, the chassis of which would be manufactured by General Motors Corporation (GMC)[4] and the bodies of which would be manufactured by Van-Con. The Contract listed the price of each chassis as $17,956, and the price of the bus bodies as

---

[2] The Final Judgment incorrectly labels the interference with prospective economic advantage claim as Count IV and the punitive damages claim as Count V of the Counterclaim; they actually were Counts V and VI, respectively.

[3] Anderson is the owner, president, and sole director of AJA Motors Corp.

[4] The cutaway chassis supplied by GMC contains the engine, transmission, drive chain, rear-end, six tires, windshield, front dash, and driver's seat.

ranging from $12,924 to $17,134, depending on passenger capacity. The contract also provided the following terms and conditions:

Standard Terms (VAN-CON/GMC SCHOOL BUS):

A)   A ten percent (10%) deposit is required upon agreement and acceptance.

B)   Chassis ordered and drop shipped to Van-Con, Inc. Middlesex, NJ.

C)   Chassis price due upon GMC Invoice.

D)   Balance due upon completion.

E)   All buses shall be inspected, taxed, titled, registered at additional cost to customer.

F)   Purchaser/lender shall furnish a guaranty of payment from a financial institution to Dealers.

G)   Prices are for Model Year 2002 only.  Price as quoted on a per unit basis.

H)   Delivery is per unit and subject to change.

I)   Chassis price may accrue interest charges.
     . . . .

Transfer of Title:

A)   Chassis MSO[5] issued upon payment of Chassis Dealer Invoice.

B)   Body [MCO] issued upon payment of Body Dealer Invoice.

C)   Shipper reserves all rights and payment prior to release of vehicles.

D)   All prices and payments shall be valued and rendered in U.S. Dollars.

Financing:

A)   A commitment letter and/or guaranty of payment shall be furnished to body and chassis dealer.

B)   Applicant approved funding payable and committed to this [Contract].

On April 25, 2002, Kailua Cab paid AJA Motors a deposit of $47,038.57 by check.  Before receiving the deposit, AJA Motors had ordered the chassis from LaBeau Brothers, Inc. (LaBeau

---

[5]   MSO stands for Manufacturer's Statement of Origin.  An alternate designation is Manufacturer's Certificate of Origin, or MCO.  For consistency, this opinion will use the term MCO.  The MCOs in the instant case list a unique GMC vehicle identification number (VIN) for each chassis.

Bros.), the chassis dealer in Illinois. The chassis order had to be placed by April 18, 2002 -- before General Motors Corporation (GMC) ended the production runs on the model and year of the vehicles ordered. On June 26, 2002, LaBeau Bros. sent invoices to AJA Motors.

Although Kailua Cab had paid AJA Motors cash for buses previously purchased, Kailua Cab requested Anderson's help in obtaining financing for the twelve buses. Anderson's personal banker from First Hawaiian Bank (FHB) referred Kailua Cab to Joy Ching (Ching), an FHB vice president. FHB did not approve the loan until September 2002. Tomasa and his sister, Betty Lou Mau (Mau), Kailua Cab's vice president and clerk, attributed the delay in obtaining the loan to probate proceedings for the estate of their father, who died March 9, 2002 and was a co-owner of property to be used as collateral. Tomasa testified that Kailua Cab could not pay for the chassis until his father's estate was settled.

## B. KAILUA CAB DELAYS PAYMENT

During July 2002, LaBeau Bros. repeatedly asked Anderson when it could expect payment for the twelve chassis. Anderson testified that he requested payment before the July 4th holiday and again on July 8. Anderson characterized Kailua Cab's response as "a plethora of excuses." Anderson testified that Tomasa said talk to Ching, Ching would refer Anderson back to Tomasa, and so it "went on and on and on all summer long." On July 29, 2002, LaBeau Bros. faxed Anderson asking when he would pay for the twelve chassis. Anderson sent the fax to Mau with a handwritten note, "I don't have an answer for this gentleman."

On October 9, 2002, FHB paid LaBeau Bros. for twelve chassis plus accrued interest. Ching sent a letter to LaBeau Bros. with a check for $218,552.48 and asked LaBeau Bros. to send the MCOs, reflecting FHB as the lienholder and Kailua Cab as the registered owner, to FHB. This letter upset Anderson, who

considered it "jumping title,"[6] which was a violation of his dealership license and the law. Anderson testified that the MCOs pass from dealer to dealer, not to consumers, and buses are not titled in the name of the customer before they are completed. He testified:

> The procedure is very simple and clear cut.
>
> When I receive the titles to the chassis, title is ownership. The titles are signed over in my name and sent to me, the dealer. It's [a] dealer to dealer transaction because these are incomplete vehicles.
>
> . . . .
>
> . . . [S]o what happens is the dealer would send the title to me within the State, and then my licensing rights are to insert, if there is a lien, to insert the lien on the title or -- and transfer -- properly transfer it into the State.

On October 14, 2002, LaBeau Bros. sent MCOs to Anderson. The front page of each MCO provided the VIN and stated that the "body type" of the vehicle referenced was an "incomplete van." An authorized GMC representative certified that the vehicle described was the property of GMC and was being transferred on June 6, 2002 to LaBeau Bros. The reverse side of each MCO provided:

> Each undersigned seller certifies to the best of his knowledge, information and belief under penalty of the law that the vehicle is new and has not been registered in this or any state at the time of delivery and the vehicle is not subject to any security interests other than those disclosed herein and warrant title to the vehicle.

In a box marked "Distributor-Dealer Assignment Number 1," AJA Motors Inc. was named as the "purchaser" and LaBeau Bros. as the "dealer," and Leslie Balthazor signed as "Agent." In a box marked "Distributor-Dealer Assignment Number 2," Kailua Cab is listed as purchaser, but no dealer or signature appears. Anderson did not sign the MCOs over to Kailua Cab. In a box marked "Lienholder," FHB, Kaneohe Branch, is listed as the first

---

[6] Anderson testified that the term "jumping title" is used in the automobile dealership industry and refers to putting the name of the customer on the title instead of the name of the dealer, which has the practical effect of passing title without paying registration fees and taxes.

lienholder. A box labeled "Odometer Disclosure for Retail Sale" is empty.

Kailua Cab made the second required payment on two completed buses in December 2002 and then on four more in March 2003. AJA Motors delivered the first bus on February 25, 2003; the second on March 28, 2003; the third on April 17, 2003; the fourth and fifth on May 11, 2003; and the sixth on May 15, 2003.

## C.    KAILUA CAB COMPLAINS ABOUT WORKMANSHIP

According to Tomasa, at the time Kailua Cab placed the order for the new buses, he requested that the new buses be constructed like the ones Kailua Cab had previously ordered, but with two exceptions: the new buses needed to have rain gutters with exits that would allow water to drain from both the front and back of each bus and each "interior school bus mirror" had to be in a certain location.

The buses delivered were not as Kailua Cab expected. Tomasa testified that on each bus the gutters were missing any exits and the warning light control panel had been moved so the "interior school bus mirror" blocked it. Tomasa claimed that when the first bus arrived, he called Anderson and told him the bus was not to specifications, but Anderson "didn't say anything." On the day the second bus was delivered, Tomasa noted the same problems. Anderson disputed Tomasa's testimony, stating that he first heard of complaints regarding the buses in early April.

Anderson sent two invoices to Ching and Kailua Cab on May 6, 2003, requesting payment for buses seven and eight, which were ready for delivery. When Anderson did not get a response from Kailua Cab, he went to Kailua Cab's bus yard on May 8, 2003 with the invoices to request payment from Tomasa. Anderson testified that Tomasa grabbed the invoices and said "I don't want them; I don't need them; get out of here" and threw the invoices in Anderson's face. Anderson further testified that on May 12, 2003, Tomasa told him that Kailua Cab's older buses had passed government inspection so the new buses would not be needed.

On May 12 and 15, 2003, Anderson delivered the fifth and sixth buses. Anderson testified that on May 16, 2003, Tomasa called him, swearing and telling him to come replace a service door on one bus. After the phone call, Anderson stopped shipment of the seventh and eighth buses, which were completed and en route from the manufacturer. A couple of days later, Anderson made arrangements to go to the bus yard on May 22, 2003 to change the door.

### D. THE INCIDENT AT KAILUA CAB'S BUS YARD AND REQUESTED REPAIRS TO THE BUSES

When Anderson arrived at the bus yard on May 22, 2003, Tomasa was sitting with three men. Anderson claimed that two of the men approached him and one grabbed him by the elbow and pulled him to a corner of the yard. Anderson pulled his arm away from the man, and the other man began pulling Anderson in another direction. Anderson testified that a woman then drove up in a 30-passenger bus, coaxed Anderson inside, and berated him over a leak near the bus's service door. Anderson left the bus, went to his car, and got a bus service door to replace the one about which Tomasa had complained. Anderson testified that the service door he was to replace was "fine from what I could see." Anderson stated that he was halfway through removing the existing door when Tomasa appeared from behind and yelled, "I told you to get out of here!" Anderson testified that Tomasa tackled him, slammed the door on his head, pushed him towards his car, hit him, stomped on his foot, and kicked him. The two men who had originally confronted Anderson came over. Anderson said Tomasa continued to hit him while the men mocked Anderson's pleas to stop. A woman drove up in a 72-passenger bus, and the two men left. Tomasa threw Anderson's tools at him and his car. Anderson scooped up his tools, put them in the trunk of his car, and told Tomasa, "you still have to pay me." Tomasa then punched Anderson on his left cheek and called for the other men to come "finish the job." Anderson got in his car and drove off the lot

and to the Beretania Street police station, where he made a report.

At trial, Kailua Cab offered the testimony of April Oliva, an employee of Kailua Cab for more than 20 years, to rebut Anderson's testimony about the incident. She testified that she was in the bus yard on May 22, 2003 and pointed out to Anderson leaking windows on her bus. She stated that she heard Tomasa tell Anderson not to fix the bus in the bus yard. She testified that Anderson and Tomasa began to argue, but neither Tomasa nor the two men pushed, hit, or touched Anderson.

By letter dated June 6, 2003, AJA Motors' attorney, Jason Wong (Wong), acknowledged that six buses had been completed and paid for pursuant to the Contract. The letter also stated Kailua Cab had been notified that an additional three buses had been completed and a demand for payment had been made. The letter warned that if Kailua Cab did not pay within five business days, AJA Motors would resell the six buses remaining under the contract.

On June 18, 2003, pursuant to an agreement of Tomasa and Anderson, the District Court of the First Circuit[7] entered an "Order Granting Mutual Injunction against Harassment," which stated that Tomasa would submit his complaints to Anderson through counsel and Anderson would "designate a State of Hawaii authorized and licensed facility" to do the repair work. Tomasa submitted to AJA Motors a list of alleged problems with each bus. In an undated "Answer to Warranty Claims from [Kailua Cab]," Anderson replied that many of the alterations requested by Tomasa could not be made because they were not covered under warranty.

E.    INSTANT SUIT FILED

On February 5, 2004, Kailua Cab's attorney sent a letter to Wong stating that Kailua Cab was "ready, willing and able to accept delivery and pay for [four] completed buses." Wong

_____

[7] The Honorable Barbara P. Richardson signed the order granting the injunction.

informed Kailua Cab the following day that he no longer represented AJA Motors.

On February 27, 2004, Kailua Cab's attorney sent AJA Motors a letter demanding delivery of the six remaining chassis. When the chassis were not delivered, Kailua Cab filed its Complaint, which alleged (1) breach of contract, (2) conversion, and (3) restitution/unjust enrichment.[8]

On July 14, 2004, AJA Motors filed its answer and a Counterclaim alleging breach of contract, breach of the covenant of good faith and fair dealing, intentional/negligent misrepresentation, estoppel, and intentional interference with AJA Motors' prospective economic advantage as the exclusive franchisee in Hawai'i for Van-Con.

On April 5, 2006, Kailua Cab filed a motion in limine to exclude any reference to the May 22, 2003 incident and to the mutual injunction against harassment, on the grounds that testimony regarding the "attack" was not relevant and was highly prejudicial and the injunction involved the two men as individuals, rather than the companies that were parties to the lawsuit. The circuit court allowed the testimony with a limiting instruction and allowed the parties to introduce only the terms of the injunction that pertained to the submission of warranty complaints.

After a five-day trial, Kailua Cab filed a motion for a directed verdict on AJA Motors's Counterclaim on the basis that AJA Motors was not a licensed motor vehicle dealer, making the contract for the sale of buses illegal and, therefore, any breach by Kailua Cab unenforceable.

The jury returned a special verdict as follows:

- AJA Motors had not breached the contract with Kailua Cab
- Kailua Cab had breached the contract

---

[8] Kailua Cab later named Van-Con as a defendant on March 23, 2005. Pursuant to a settlement agreement, Kailua Cab and Van-Con stipulated to dismiss all claims between them.

- Kailua Cab had interfered with AJA Motors's prospective economic advantage
- Kailua Cab intentionally made misrepresentations and
- Kailua Cab negligently made misrepresentations

The jury awarded AJA Motors $1.00 in damages for the breach of contract, $100,000 in damages for the interference with prospective economic advantage claim, no monetary damages for the misrepresentation claims, and $50,000 in punitive damages.

On May 26, 2006, the circuit court granted Kailua Cab's motion for directed verdict on AJA Motors's Counterclaim for breach of contract, inviting the appellate court to decide whether a corporation whose president is a licensed dealer can legally contract for sale of a motor vehicle when the corporation does not have a license.

On September 26, 2006, the circuit court entered the Final Judgment in favor of AJA Motors and against Kailua Cab on AJA Motors' tortious interference and punitive damages claims and expressly dismissed all other unidentified claims, counterclaims, and cross-claims.

On September 27, 2006, Kailua Cab filed a Motion for Entry of Judgment as a Matter of Law (Motion for Judgment as a Matter of Law) and a Motion for New Trial and/or for a Reduction in Damages (Motion for New Trial). The circuit court denied both motions.

Kailua Cab timely appealed.

## II. POINTS ON APPEAL

Kailua Cab's points of error on appeal are as follows:

1. The jury failed to follow the law, as set out in court instructions, in finding that, under the facts presented, there was no conversion, but instead based its verdict on emotion, prejudice, and irritation over the length of trial.

2. The jury failed to follow the law, as set out in court instructions, in finding that, under the evidence presented, there was no breach of contract by [AJA Motors], but instead based its verdict on emotion, prejudice, and irritation over the length of trial.

3.     The jury failed to follow the law, as set out in court instructions, in finding that [Kailua Cab] had intentionally interfered with [AJA Motors'] prospective business advantage, but instead based its verdict on emotion, prejudice, and irritation over the length of trial.

4.     The jury failed to follow the law regarding punitive damages in the State of Hawaii, and as set out in court instructions, in finding that [AJA Motors] was entitled to punitive damages, and moreover awarded punitive damages out of emotional response and prejudice.

5.     The trial court erred in admitting testimony of [Anderson] regarding an alleged attack on his person where [Anderson] was not a party to the action, where there was little probative value to such testimony, and where such testimony would be unfairly prejudicial to [Kailua Cab].

6.     The jury failed to heed limiting instructions with regard to consideration of [Anderson's] testimony describing an alleged personal attack.

7.     The damages awarded to [AJA Motors] for intentional interference with prospective business advantage exceed the amount justified by the evidence.

AJA Motors correctly notes that Kailua Cab's opening brief is not in accordance with Hawai'i Rules of Appellate Procedure (HRAP) Rule 28(b)(4).  Specifically, Kailua Cab's points of error do not state where in the record the alleged errors occurred nor where they were brought to the attention of the court.  HRAP 28(b)(4).  Although AJA Motors argues that points not presented in accordance with HRAP Rule 28(b) should be disregarded or reviewed only for plain error, the appellate court has a policy of affording litigants the opportunity "to have their cases heard on the merits, where possible." O'Connor v. Diocese of Honolulu, 77 Hawai'i 383, 386, 885 P.2d 361, 364 (1994).

### III.   STANDARDS OF REVIEW

### A.    MOTION FOR JUDGMENT AS A MATTER OF LAW/NEW TRIAL

A party seeking appellate reversal of a jury verdict based upon a claim of insufficient evidence is, in effect, seeking appellate review of the trial court's denial of either a motion for judgment as a matter of law or a motion for a new trial.  Stanford Carr Dev. Corp. v. Unity House, Inc., 111

Hawai'i 286, 296, 141 P.3d 459, 469 (2006); see also Kramer v. Ellett, 108 Hawai'i 426, 430, 121 P.3d 406, 410 (2005).

A trial court's ruling on a motion for judgment as a matter of law is reviewed de novo. Id. "Verdicts based on conflicting evidence will not be set aside where there is substantial evidence to support the jury's findings. [The Hawai'i Supreme Court has] defined 'substantial evidence' as credible evidence which is of sufficient quality and probative value to enable a person of reasonable caution to support a conclusion." Stanford Carr, 111 Hawai'i at 296, 141 P.3d at 469 (brackets in original omitted) (quoting Carr v. Strode, 79 Hawai'i 475, 486, 904 P.2d 489, 500 (1995)). In deciding a motion for judgment as a matter of law, "the evidence and the inferences which may be fairly drawn therefrom must be considered in the light most favorable to the nonmoving party and the motion may be granted only where there can be but one reasonable conclusion as to the proper judgment." Kramer, 108 Hawai'i at 430, 121 P.3d at 410 (internal quotation marks, citation, and brackets omitted). "Thus, where there is conflicting evidence or there is insufficient evidence to make a one-way verdict proper, [judgment as matter of law] should not be awarded. Stanford Carr, 111 Hawai'i at 296, 141 P.3d at 469 (internal quotation marks, citation, brackets in original, and ellipsis omitted).

The trial court's denial of a motion for a new trial, however, is reviewed for a clear abuse of discretion. Id. The movant on a motion for a new trial need not convince the trial court to rule that no substantial evidence supports movant's opponent's case, but only that the verdict rendered for the opponent is against the manifest weight of the evidence. Id.

B.    ADMISSIBILITY OF EVIDENCE

Different standards of review must be applied to trial court decisions regarding the admissibility of evidence, depending on the requirements of the particular rule of evidence at issue. When application of a particular evidentiary rule can yield only one correct result, the proper standard for appellate review is the right/wrong standard.

12

> Where the evidentiary ruling at issue concerns
> admissibility based upon relevance, under Hawaii Rules of
> Evidence (HRE) Rules 401 and 402, the proper standard of
> appellate review is the right/wrong standard.
>
> Evidentiary decisions based on HRE Rule 403, which
> require a "judgment call" on the part of the trial court,
> are reviewed for an abuse of discretion. The trial court
> abuses its discretion when it clearly exceeds the bounds of
> reason or disregards rules or principles of law or practice
> to the substantial detriment of a party litigant.

Tabieros v. Clark Equip. Co., 85 Hawai'i 336, 350-51, 944 P.2d 1279, 1293-94 (1997) (internal quotation marks, citations, and brackets omitted; block quote format changed) (quoting State v. Arceo, 84 Hawai'i 1, 11, 928 P.2d 843, 853 (1996)).

## IV.  DISCUSSION

### A.    CONVERSION

Kailua Cab contends that AJA Motors converted six chassis that Kailua Cab had paid for with the FHB loan but never received. The jury was instructed, without objection, that to prevail on the claim of conversion Kailua Cab must prove three elements:  (1)  Kailua Cab "owned or had the right to possession of the property;" (2) "at the time when [Kailua Cab] owned or had the right to possession of the property, [AJA Motors] exerted dominion over the property in denial of or inconsistent with [Kailua Cab's] ownership or right to possession of the property;" and (3) "[AJA Motors'] conduct legally caused damage to [Kailua Cab]."  See Tsuru v. Bayer, 25 Haw. 693 (1920).

Anderson testified that AJA Motors sold vehicles fabricated upon the six chassis to other entities, including the DOE, and AJA Motors did not return any money to Kailua Cab after Kailua Cab canceled delivery of the final six buses. The parties dispute whether Kailua Cab "owned" or had a "right of possession" in the six chassis when they were sold, as part of completed buses, to other customers.

It is undisputed that Kailua Cab bargained and paid for the six chassis. AJA Motors sold the chassis to other entities and kept the money from the sale; money that should have gone to Kailua Cab. Therefore, the circuit court erred in not granting

Kailua Cab's Motion for Judgment as a Matter of Law as to its conversion claim.

### B.   BREACH OF CONTRACT

Kailua Cab contends the jury failed to follow the law in concluding that AJA Motors did not breach the Contract.   On appeal, Kailua Cab argues that AJA Motors breached the Contract by failing to (1) turn over the chassis upon demand and (2) deliver buses according to the specifications requested.

In regard to the first argument, we have concluded that Kailua Cab was entitled to the proceeds from AJA Motors' sale of the chassis.   In regard to the second argument, the issue is whether the buses were non-conforming and, if so, whether the "nonconformity substantially impair[ed] the value of [the] installment and cannot be cured."

Although Anderson and Tomasa presented conflicting testimony, there is sufficient evidence that the buses delivered were in conformity with the Contract.   Tomasa's testimony is the sole evidence that he had specified the mirrors, control panel, and gutters were to be manufactured in a way other than how they were when delivered.   Although Tomasa said these parts were to be installed on the twelve buses in a manner identical to buses previously ordered from AJA Motors, under cross-examination he admitted that five of the six previously-ordered buses had gutters with the same design about which he was complaining. Anderson testified that at the time the Contract was signed, Tomasa did not specify any changes to the buses' design, i.e., the gutters and placement of the mirrors.   Moreover, the Contract's second page, titled "Base Body Standard Options," lists specifications for the buses, but makes no mention of modifications to the gutters, control panel, or rear-view mirrors.   Additionally, Anderson testified that Tomasa wanted alterations to the manufacturer's designs that, in some cases, would not have been covered by the manufacturer's warranty.

In short, there was conflicting testimony about what the specifications were in the Contract.   Where there is

conflicting evidence and the matter hinges on the credibility of witnesses, the trial court's outcome will generally not be disturbed on appeal.  In re Estate of Herbert, 90 Hawai'i 443, 454, 979 P.2d 39, 50 (1999).  From Anderson's testimony, there is sufficient evidence from which the jury could have concluded that Kailua Cab's complaints with the buses stemmed from Tomasa's failure to specify changes before signing the Contract.  Further, there was sufficient evidence to conclude that the delivered buses conformed to the Contract.  Accordingly, the trial court did not err in denying Kailua Cab's Motion for New Trial on the issue of AJA Motors' alleged breach of contract as to the buses.

C.    INTENTIONAL INTERFERENCE WITH PROSPECTIVE ECONOMIC
      ADVANTAGE

A tortious interference with a prospective business advantage claim requires a showing that there is a "colorable economic relationship between the plaintiff and a third party" to be protected.  Hawaii Med. Ass'n v. Hawaii Med. Serv. Ass'n, Inc., 113 Hawai'i 77, 116, 148 P.3d 1179, 1218 (2006) (quoting Locricchio v. Legal Servs. Corp., 833 F.2d 1352, 1357 (9th Cir. 1987)).  It is undisputed that AJA Motors and Van-Con had a franchise agreement, which was terminated in November 2002.  As such, Kailua Cab's first argument -- that AJA Motors had no prospective business advantage with which to interfere -- fails.

We then turn to Kailua Cab's second argument:  AJA Motors failed to demonstrate that Kailua Cab intended to interfere.  Hawai'i's appellate courts have said that tortious interference "requires a state of mind or motive more culpable than mere intent."  Hawaii Med. Ass'n, 113 Hawai'i at 116, 148 P.3d at 1218 (quoting Locricchio, 833 F.2d at 1358).  This intent "denotes purposefully improper interference" or, in other words, "the plaintiff must prove that the defendant either pursued an improper objective of harming the plaintiff or used wrongful means that caused injury in fact."  Hawaii Med. Ass'n, 113 Hawai'i at 116, 148 P.3d at 1218 (quoting Omega Envtl., Inc. v.

15

_Gilbarco, Inc._, 127 F.3d 1157, 1166 (9th Cir. 1997)). See also
_Meridian Mortgage, Inc. v. First Hawaiian Bank_, 109 Hawaiʻi 35,
48, 122 P.3d 1133, 1146 (App. 2005).

### 1.    "Wrongful means"

We look first at whether Kailua Cab employed wrongful
means to disrupt AJA Motors's business.  In its Counterclaim and
at trial, AJA Motors based the interference claim on Kailua Cab's
five-month delay in paying for the chassis[9] and its refusal to
pay for the last six buses.  On appeal, AJA Motors contends
Kailua Cab interfered with its prospective business advantage
during the summer of 2002 when AJA Motors asked Kailua Cab to pay
for the chassis, Kailua Cab did not pay, and Kailua Cab "by its
own admission kept everyone 'in the dark' about what was
happening."  These actions were the basis for AJA Motors's
misrepresentation claim.

### a.    Breach of Contract as wrongful means

Kailua Cab breached the terms of the contract when it
failed to pay for the chassis when presented with the invoices,
failed to accept delivery of conforming buses, and refused to
accept delivery of and pay for the final six buses.  The question
here is whether contractual breaches constitute "wrongful means"
sufficient to prove an intent to interfere with prospective
business relations.  In _Kapunakea Partners v. Equilon Enterprises
LLC_, 679 F. Supp. 2d 1203, 1218-19 (D. Hawaiʻi 2009), the United
States District Court for the District of Hawaiʻi (District
Court) held they do not.  Observing that the question had not
been answered by a Hawaiʻi state court, the District Court
predicted that if presented with the question "the Hawaiʻi
Supreme Court would hold that a breach of contract, even if done
for improper purposes, does not without more give rise to
improper interference for purposes of a tortious interference
with a prospective business advantage claim." _Id._ at 1219.

---

[9]  An alternate theory, proposed by AJA Motors in its initial complaint
but not pursued on appeal, was that Kailua Cab interfered with AJA Motors's
relationship with LaBeau Bros.

The District Court based its conclusion on the reasoning found in the treatise Business Torts, which noted that the wrongful conduct "must also be more than a mere breach of contract." Kapunakea Partners, 679 F. Supp. 2d at 1218 (quoting 2 Phillip J. Campanella et al., Business Torts § 12.03, at 12-49 (rev. ed. 2009)). The District Court noted that the treatise pointed to the California case of Quantum Associates, Inc. v. Symbol Technologies, Inc., No. C 01-02789 CRB, 2002 WL 1735356, at *2 (N.D. Cal. July 12, 2002) (quoting Khoury v. Maly's of California, Inc., 17 Cal. Rptr. 2d 708, 712 (Cal. Ct. App. 1993)), in which the United States District Court for the Northern District of California observed that allowing a tortious interference claim to proceed solely on the basis0 of a breach of contract "would be contrary to the cautious policy of the courts about extending tort remedies to ordinary commercial contracts." Kapunakea Partners, 679 F. Supp. 2d at 1218.

Further, the District Court pointed to Francis v. Lee Enterprises, Inc., 89 Hawai'i 234, 244, 971 P.2d 707, 717 (1999), which abolished the tort of tortious breach of contract. Kapunakea Partners, 679 F. Supp. 2d at 1219. The District Court noted that "if a court were to conclude that a breach of contract could satisfy the improper interference element of the tort of tortious interference with a prospective business advantage under Hawai'i law, it would be tantamount to resurrecting the tort of tortious breach of contract, albeit it in certain limited circumstances." Id.

Other jurisdictions have also concluded that a breach of contract is insufficient to prove an intent to interfere with a prospective business advantage. See, e.g., Leigh Furniture & Carpet Co. v. Isom, 657 P.2d 293, 309 (Utah 1982) ("A deliberate breach of contract, even where employed to secure economic advantage, is not, by itself, an 'improper means.'"); Volcjak v. Washington County Hosp. Ass'n, 723 A.2d 463, 479 (Md. Ct. Spec. App. 1999) ("We have declined to recognize that there exists such a wrongful act when there is merely a breach of contract that has

an incidental effect on the plaintiff's business relations with third parties."). <u>See also</u> 44B Am. Jur. 2d <u>Interference</u> § 1 (2007) ("A simple breach of contract is not to be considered a tort unless a legal duty independent of the contract itself has been violated, and this legal duty must spring from circumstances extraneous to, and not constituting elements of, the contract[.]"). The Utah Supreme Court reasoned that "[b]ecause the law remedies breaches of contract with damages calculated to give the aggrieved party the benefit of the bargain, there is no need for an additional remedy in tort (unless the defendant's conduct would constitute a tort independent of the contract)." <u>Leigh Furniture</u>, 657 P.2d at 309.

Adopting this reasoning, we conclude that AJA Motors cannot as a matter of law sustain a claim for tortious interference based on Kailua Cab's breach of contract alone.

### b.    Misrepresentation as "wrongful means"

AJA Motors contends on appeal that the interference was caused during the summer of 2002, when Anderson demanded payment for the chassis. AJA Motors argues that Kailua Cab "knew of the problems with financing even before it entered into the contract . . . .[,] yet entered into the contract and kept its problems secret." This "secrecy" was at the heart of AJA Motors's misrepresentation claim.

Assuming arguendo that misrepresentations were made,[10] there is a question whether such misrepresentations would prove that Kailua Cab acted by "wrongful means" to interfere. "[C]onduct constituting tortious interference with business relations is, by definition, conduct directed not at the plaintiff itself, but at the party with which the plaintiff has or seeks to have a relationship." <u>Carvel Corp. v. Noonan</u>, 818 N.E.2d 1100, 1104 (N.Y. 2004) (citing <u>G.K.A. Beverage Corp. v.</u>

---

[10] The circuit court, pursuant to Kailua Cab's motion for a directed verdict, dismissed the jury's finding that Kailua Cab had intentionally and negligently made misrepresentations that harmed AJA Motors, admitting that the court "didn't really give it much thought, honestly, because no damages had been given for that."

Honickman, 55 F.3d 762, 768 (2d Cir. 1995)). The facts supporting AJA Motors's misrepresentation claim, when taken in the light most favorable to AJA Motors, are that Kailua Cab intentionally hid the reasons for the delay in obtaining financing from Anderson. Any alleged misrepresentations made regarding the buses were made to Anderson and AJA Motors, not to Van-Con. Moreover, there is no indication in the record that Kailua Cab had any contact with Van-Con prior to a letter from FHB, co-signed by Tomasa, to Van-Con ordering Van-Con to transfer the chassis to another body manufacturer to complete the buses after Kailua Cab had repudiated the contract. Because AJA Motors failed to show the alleged misrepresentations were directed at Van-Con (the third party with whom AJA Motors had a business expectancy), Kailua Cab's representations, even if tortious, could not be "wrongful conduct" in an interference claim. Carvel Corp., 818 N.E.2d at 1104.

### 2. "Improper objective"

The acts of interference cited in AJA Motors's answering brief were not "wrongful means." Therefore, we examine whether Kailua Cab pursued an "improper objective" because tort liability can be imposed even where otherwise legitimate means were used if the defendant had an improper motive for the interference. Kutcher v. Zimmerman, 87 Hawaiʻi 394, 407, 957 P.2d 1076, 1089 (App. 1998).

The proposition that an "improper objective" alone will suffice to prove an intent to interfere appears to be "clearly established." See James O. Pearson, Jr., Annotation, Liability for Interference with at Will Business Relationship, 5 A.L.R. 4th 9 § 8(b) (1981). Nevertheless, courts and commentators have questioned the applicability of improper motive as the basis for liability in the absence of wrongful means. For example, the Utah Supreme Court in Pratt v. Prodata, Inc., 885 P.2d 786, 789 n.3 (Utah 1994), expressed "grave doubts" about the use of the improper-purpose prong specifically in the context of commercial dealings, stating that the

> improper-purpose test creates a trap for the wary and unwary alike: business practices that are found to be "proper means" by a finder of fact and may otherwise be regarded as wholly legitimate under our capitalistic economic system may be recast through a jury's unguided exercise of its moral judgment into examples of spite or malice.

The Utah court also expressed concern that a finding of improper purpose is shielded from appellate review because a party's intent is a finding of fact. Id. In California's seminal case on the subject, one judge opined that "the common law on the tort of intentional interference with prospective economic advantage . . . is fast approaching incoherence" because of the "dissonance caused by such terms as 'malice,' 'justification,' and 'privilege.'" Della Penna v. Toyota Motor Sales, U.S.A., Inc., 902 P.2d 740, 752 (Cal. 1995) (Mosk, J., concurring); see also Harvey S. Perlman, Interference with Contract and Other Economic Expectancies: A Clash Of Tort and Contract Doctrine, 49 U. Chi. L. Rev. 61, 95 (1982) ("Proof of motivation, however, is error-prone and carries social costs.").[11]

Hawai'i courts have used several formulations to define the intent required to sustain a verdict for tortious interference with a prospective business advantage. Neither party presents argument on appeal as to which one should be applied.

The first formulation can be taken from the language of the jury instructions themselves -- AJA Motors must demonstrate that Kailua Cab had a "purposeful intent to interfere." This language is derived from the treatise 2 Joseph D. Zamore, Business Torts, §§ 12.01[4]-12.03[6], at 12-11 to 12-46 (1999), cited to in Robert's Hawaii School Bus, Inc. v. Laupahoehoe Transportation Co., 91 Hawai'i 224, 258, 982 P.2d 853, 887 (1999).

---

[11] Judge Mosk and Professor Perlman favor the use of an objective test, i.e., whether the interfering conduct was unlawful. Della Penna, 902 P.2d at 760-61; Perlman, supra, at 128 ("The ambiguity of a malice standard and the inevitable costs of applying it suggest that liability should be based only on objective indicia of activity producing social loss.").

Although the Hawai'i Supreme Court in <u>Roberts Hawaii</u> established "purposeful intent to interfere" as an element of the tort, the court also recited the seven factors, provided in the <u>Restatement (Second) of Torts</u>, that courts should use to determine "whether an actor's conduct . . . is improper or not." <u>Robert's Hawaii</u>, 91 Hawai'i at 258, 982 P.2d at 887 (quoting <u>Restatement (Second) of Torts</u> § 767, at 25-26 (1979)). The factor most applicable here -- "the actor's motive" -- as a "motive to injure another or to vent one's ill will on him [that] serves no socially useful purpose." <u>Restatement (Second) of Torts</u> § 767 cmt. d (1979).

This court in <u>Kutcher</u> rejected the approach taken in <u>Restatement (Second) of Torts</u> as unworkable and instead adopted another formulation for "improper purpose" that focused on the "unjustified" nature of the interference. <u>Kutcher</u>, 87 Hawai'i at 406-07, 957 P.2d at 1088-89. This approach avoids imposing liability where the interference protects legitimate interests, such as competition, and is consistent with other jurisdictions that require proof of "legal malice -- that is, to an intent to do harm without justification." Pearson, <u>supra</u> 16 § 2(a). However, the Hawai'i Supreme Court has implied that existence of justification is irrelevant to an interference with a prospective business advantage claim. <u>Whitey's Boat Cruises, Inc. v. Napali-Kauai Boat Charters, Inc.</u>, 110 Hawai'i 302, 317 n.25, 132 P.3d 1213, 1228 n.25 (2006) (stating that interference with prospective business advantage, unlike interference with prospective contractual relations, does not require a showing that the defendant acted without proper justification).

Still another formulation is seen in <u>Omega Environmental, Inc. v. Gilbarco, Inc.</u>, <u>supra</u>, a case repeatedly cited to by Hawai'i courts. <u>See, e.g.</u>, <u>Robert's Hawaii</u>, 91 Hawai'i at 258, 982 P.2d at 887; <u>Hawaii Med. Ass'n</u>, 113 Hawai'i at 116, 148 P.3d at 1218; <u>Meridian Mortgage</u>, 109 Hawai'i at 48, 122 P.3d at 1146. The Ninth Circuit stated the plaintiff must demonstrate that the defendant "pursued an improper objective of

21

harming the plaintiff." Omega Envtl., 127 F.3d at 1166 (internal quotation marks and citations omitted). The court, however, emphasized that "[a]sserting one's rights to maximize economic interests does not create an inference of ill will or improper purpose." Id. (internal quotation marks and citation omitted).

There is no evidence to support a conclusion that Kailua Cab had the specific intent to disrupt the relationship between AJA Motors and Van-Con, intended to harm AJA Motors, or acted without justification. AJA Motors does not speculate on Kailua Cab's motive beyond saying that Kailua Cab wanted to avoid paying for the final six buses.

It has been said that the plaintiff need not prove the defendant had the "specific intent, or purpose of disrupting the plaintiff's prospective economic advantage," but rather could prevail on a showing that "the defendant knew that the interference was certain or substantially certain to occur as a result of its action." Korea Supply Co. v. Lockheed Martin Corp., 63 P.3d 937, 949-50 (Cal. 2003). "The rule applies, in other words, to an interference that is incidental to the actor's independent purpose and desire but known to him to be a necessary consequence of his action." Id. at 951. It is not "substantially certain" that a buyer's failure to pay will result in a manufacturer's terminating its business relationship with a dealer. Thus, the severance of the franchiser-franchisee relationship between Van-Con and AJA Motors is not a "necessary consequence" of the dispute between AJA Motors and Kailua Cab. Although it is the jury's province to determine a party's intent, see Bodell Constr. Co. v. Ohio Pac. Tech, Inc., 458 F. Supp. 2d 1153, 1165 (D. Hawai'i 2006), in the instant case there is insufficient evidence from which the jury could have concluded that Kailua Cab had the requisite intent to interfere with AJA's relationship with Van-Con.

D.    DAMAGES

Because AJA Motors has not offered sufficient evidence that Kailua Cab intended to interfere with AJA Motors'

prospective advantage, we need not discuss Kailua Cab's argument that AJA Motors failed to introduce evidence of damages sustained by AJA Motors, rather than Anderson alone. Furthermore, because punitive damages applied only where the jury awarded damages on AJA Motors' counterclaims for misrepresentation or intentional interference with prospective economic advantage and there were no underlying torts, there could be no punitive damages award.

### E. ADMITTING ANDERSON'S TESTIMONY

Kailua Cab challenges the admission of Anderson's testimony regarding the May 22, 2003 incident because "Anderson worked himself into an emotional frenzy before the jury, and the jury heard 24 pages of uninterrupted bitter vitriol and inflammatory language," including references to Tomasa and his employees as "thugs," a "gang," and "hired assailants." Kailua Cab also accurately notes that Anderson's testimony is peppered throughout with references to the incident.

The issue on appeal is whether the court abused its discretion in admitting Anderson's testimony. Kailua Cab does not dispute that testimony regarding the attack was relevant. Kailua Cab, however, argued at trial that testimony regarding the incident should be excluded because it was unduly prejudicial, confusing, and distracting for the jury, and therefore inadmissible under HRE Rule 403. Rule 403 provides that relevant evidence "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Rule 403 outlines "a cost-benefit calculus" that requires the trial court to use its discretion to achieve the "delicate balance between probative value and prejudicial effect." Kaeo v. Davis, 68 Haw. 447, 454, 719 P.2d 387, 392 (1986).

The circuit court weighed the probative value of Anderson's testimony against the prejudice to Kailua Cab and

concluded there was some prejudice "because it goes to bad character depending on who[m] [the jurors] believe." Nevertheless, the circuit court also stated that the assault had some probative value in that it explained Anderson's failure to do repairs -- "a fact of consequence." The circuit court held that "[w]eighing relevance, probative value, need and the unfair prejudice, confusion and waste of time, I still feel that the undue prejudice and waste of time does not outweigh substantially the probative value and need for this evidence." It is clear the circuit court applied the appropriate "cost-benefit calculus" and therefore did not abuse its discretion in not excluding Anderson's testimony regarding the incident.

Furthermore, the circuit court gave the following limiting instruction before Tomasa testified on cross-examination about the incident:

> THE COURT: Ladies and gentlemen, you're going to hear about evidence about an alleged incident on May 22, 2003.
>
> Sometimes in a trial, evidence is offered for a limited purpose, and when that occurs, you can only consider that evidence for that limited purpose, and that applies to any evidence that you will hear about . . . an alleged incident on May 22, 2003.
>
> The evidence you're about to hear about this alleged incident, if believed by you, may be considered only on the issue of whether or not [AJA Motors] failed to make repairs.
>
> You may not use this evidence for any other purpose in this case.

The circuit court also gave the instruction again before Anderson testified about the incident.

Kailua Cab contends the "jury failed to heed limiting instructions." However, where the judge has given limiting instructions to the jury, the jury is presumed to have followed the court's instructions. See, e.g., Shanghai Inv. Co. v. Alteka Co., 92 Hawai'i 482, 499, 993 P.2d 516, 533 (2000), overruled on other grounds by Blair v. Ing, 96 Hawai'i 327, 31 P.3d 184 (2001); State v. Konohia, 106 Hawai'i 517, 528, 107 P.3d 1190, 1201 (App. 2005). Analogously, the Hawai'i Supreme Court has allowed one party's "inflammatory" testimony that alleged an

24

opponent was tied to organized crime when a limiting instruction was given. Shanghai Inv. Co., 92 Hawai'i at 498-99, 993 P.2d at 532-33. Kailua Cab's disagreement with the verdict does not prove that the jury disregarded the circuit court's instructions.

## V. CONCLUSION

The Final Judgment filed on September 26, 2006 in the Circuit Court of the First Circuit is vacated, and this case is remanded for further proceedings consistent with this opinion.

DATED: Honolulu, Hawai'i, April 7, 2011.

On the briefs:

Stephen D. Tom
Marie E. Riley
(White & Tom)
for Plaintiff-Appellant.

Charles H. Brower
for Defendant-Appellee.

Presiding Judge

Associate Judge

Associate Judge